# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LYNN HENDERSON, KRISTINA KULON, B. DAVID MORBY, JASON ROBINSON, KEVIN MORRIS, and JOHN LEET, individually and on behalf of others similarly situated,<br><br>      Plaintiffs,<br><br>  vs.<br><br>VOLVO CARS OF NORTH AMERICA, LLC, and VOLVO CAR CORPORATION,<br><br>      Defendants. | No. 2:09-cv-04146-DMC-MF<br><br><br>**CLASS ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Joseph G. Sauder
Matthew D. Schelkopf
Benjamin F. Johns
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041

Christopher G. Hayes
LAW OFFICE OF
CHRISTOPHER G. HAYES
225 South Church Street
West Chester, PA 19382

Bruce D. Greenberg
LITE DEPALMA GREENBERG &
RIVAS, LLC
Two Gateway Center
12th Floor
Newark, NJ  07102

Daniel C. Levin
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street
Philadelphia, PA  19106

*Counsel for Plaintiffs*
*[Additional Counsel on Signature Page]*

- 1 -

Plaintiffs Lynn Henderson, Kristina Kulon, B. David Morby, Jason Robinson, Kevin Morris, and John Leet (together, "Plaintiffs"), bring this action against Defendants Volvo Cars of North America, LLC ("Volvo NA") and Volvo Car Corporation ("Volvo CC") (collectively "Defendants" or "Volvo"), by and through their attorneys, individually and behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.      This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a nationwide class of current and former Volvo vehicle owners and lessees with defective transmissions in their purchased and/or leased Volvo XC90 T6 vehicles ("Vehicles").

2.      This action arises from Defendants' failure, despite their longstanding knowledge of the problem, to disclose to Plaintiffs and other consumers that Volvo model XC90 T6 vehicles, model years 2003 through 2005, equipped with a General Motors ("GM") sourced, and Volvo modified, 4T65 automatic transmission (collectively, the "class vehicles") are predisposed to slippage, hesitation, harshness, premature clutch wear, transmission fluid contamination by axle fluid, differential fluid, and/or engine coolant, internal metal debris, and overheating

ultimately resulting in very serious and expensive damage to, and/or

catastrophic failure of the transmission within the class vehicles

(collectively, the "transmission problem").  Not only did Volvo actively

conceal the fact that this particular component is defective (and

requires costly repairs to fix), but it did not reveal that the existence of

this defect would diminish the intrinsic and resale value of the vehicle.

Additionally, the transmission problem causes the vehicle to enter an

emergency "Limp Mode" whereby the transmission becomes locked in

gear, posing a serious safety concern to the occupants of class vehicles,

the occupants of other vehicles, and/or the public.

3.     Defendants also concealed, suppressed, and failed to disclose

that the transmission problem in class vehicles emanates from their

defective vehicle design, including the mating of a Volvo modified GM

4T65 automatic transmission ("4T65 transmission") to the XC90 2.9L 24

valve twin turbocharged inline 6 cylinder with 268 horsepower and 280

pound-feet of torque ("T6 engine"), weighing approximately 4,500

pounds.[1]  The higher output T6 engine, offered under the T6 model of

the XC90, coupled with the inappropriate computer control and/or

---

[1] The original GM 4T65 transmission platform was only rated to handle a maximum of 280 ft-lb of torque.

Transmission Control Module ("TCM") of the transmission, Volvo modified valve body and internals, heavy vehicle weight with all-wheel drive, and potential transmission fluid contamination issues, allowing differential fluid, axle fluid and/or engine coolant to enter and mix with the transmission fluid, cause transmission slippage, premature clutch wear, fluid contamination, internal metal debris, and overheating ultimately resulting in catastrophic failure of the transmission within the class vehicles ("defective vehicle design").   The transmissions in class vehicles are uniformly and inherently defective in design, and prematurely fail under normal operating conditions well in advance of their expected useful life.

4.     Upon information and belief, Defendants have been aware for years of the true nature and cause of the transmission problem in class vehicles.  This knowledge is evidenced by widespread complaints on the internet and elsewhere about the transmission problem, accounts from class members who have complained about this very issue to Defendants, and technical service bulletins issued by Defendants for the purpose of attempting to address this problem.  Notwithstanding this knowledge, Defendants have intentionally withheld from, and/or

misrepresented to Plaintiffs and other consumers of class vehicles this material information.  Meanwhile, Defendants made numerous affirmative statements touting the high quality and reliability of the class vehicles.

5.     As a result of the transmission problem and defective vehicle design, Defendants have benefited from collecting funds from Volvo customers for vehicle service procedures such as computer re-programming and software updates, transmission fluid flushing and changing, and troubleshooting and diagnosing transmission complaints when in fact Defendants knew the true cause of such transmission problems within the class vehicles was the defective vehicle design.

6.     Many owners and lessees of class vehicles have had to repair or replace their transmissions multiple times, thereby incurring costly transmission repairs and/or replacements as needed to return their vehicles to expected operating condition.

7.     The class vehicles pose significant safety risks as a result of the transmission problem and/or defective vehicle design.  The transmission problem causes the vehicle to enter an emergency "Limp Mode" whereby the transmission becomes locked in a single gear.  This

mode creates a severe delay in acceleration, unpredictable vehicle acceleration response and decreased and/or limited highway traveling speed, thereby posing a serious safety concern to the occupants of the class vehicles, the occupants of other vehicles, and/or the public concern.

8.      Additionally, the transmission problem and/or defective vehicle design causes the transmission to slip and/or hesitate thereby creating a severe delay in acceleration and unpredictable vehicle acceleration response.  Furthermore, the transmission problem can cause the vehicle to experience a sudden and unexpected transmission failure whereby the vehicle will not accelerate and/or move under its own power.  This creates a serious safety concern to the occupants of class vehicles, the occupants of other vehicles, and/or the public.

9.      As a result of Defendants' unfair, deceptive and/or fraudulent business practices, as set forth herein, the class vehicles have a lower market value and are inherently worth less than they would be in the absence of the transmission problem.

10.      For customers with vehicles within the written warranty period, Volvo has done no more than to temporarily repair the 4T65 transmission or to replace it with other similarly defective and

inherently failure-prone transmissions. Volvo has refused to take any action to correct this concealed design defect when it manifests in vehicles outside the warranty period. Since the transmission problem typically manifests shortly outside of the warranty period for the class vehicles – and given Defendants' knowledge of this concealed design defect – Volvo's attempt to limit the warranty with respect to the transmission problem is unconscionable here.

11.    As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of class vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value.

12.    Plaintiffs bring this action to redress Defendants' violations of the New Jersey Consumer Fraud Act and other consumer protection statutes, and seek recovery for Defendants' negligent misrepresentations, breach of express warranty, breach of implied warranty, the covenant of good faith and fair dealing, common law fraud, and unjust enrichment.

## JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§1332(d)(2) and (6) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.   Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants have a North American headquarters in this jurisdiction, transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be a citizen of this district.  Additionally, Defendants have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of class vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

15.   This Court has personal jurisdiction over Defendants Volvo

CC and Volvo NA.  Defendants' North American corporate headquarters is located in Rockleigh, New Jersey.  As such, they have conducted substantial business in this judicial district, and intentionally and purposefully placed class vehicles into the stream of commerce within the districts of New Jersey and throughout the United States.

## THE PARTIES

### The Plaintiffs

### A.    Plaintiff Henderson.

16.    Plaintiff Lynn Henderson ("Henderson") is an adult individual and a citizen of the State of North Carolina, residing at 4417 Fairview Ridge Lane in the city of Apex.

17.    On or about November 23, 2004, Plaintiff Henderson purchased a 2004 Volvo XC90 T6 equipped with a 4T65 transmission from Lehman Volvo in York, Pennsylvania.[2]  At the time of purchase, her vehicle's odometer registered 10,042 miles.[3]

---

[2] Lehman Volvo advertises itself as being York County's exclusive authorized Volvo retailer providing award winning sales, service, and parts.

[3] Volvo acknowledges that owners, who have purchased a previously owned Volvo where the New Vehicle Warranty has not expired, are entitled to the remaining portion of that warranty. *See* 2004 Volvo Warranty and Service Records Information, p.6.

18.     Plaintiff Henderson purchased (and still owns) this vehicle for personal, family and/or household uses.  Plaintiff Henderson's vehicle bears Vehicle Identification Number: YV1CZ91H641064498.

19.     On or about June 21, 2007, Henderson had her vehicle serviced at Volvo of Cary in Cary, North Carolina to address the transmission problem, of which she became aware when a "transmission service urgent" alert message displayed inside her vehicle due to the defective vehicle design.

20.     On or about June 26, 2007, Henderson paid the labor costs, totaling almost $1,900.00, to Volvo of Cary for a replacement transmission ("Replacement 4T65") as required to replace the original and failed 4T65 transmission in her vehicle.  Plaintiff Henderson's vehicle required this Replacement Transmission after having suffered the above transmission problem at only 68,306 total miles.

21.     On or about July 7, 2009, Plaintiff again began to experience the transmission problem in her Volvo when the "transmission service urgent" alert message again displayed in her vehicle.  She immediately took the vehicle back to Volvo of Cary for service.

22.     According to service records, Volvo of Cary downloaded TCM

software and performed a three (3) mile test drive. Plaintiff Henderson paid approximately $116.25 for Volvo's attempt to resolve problems associated with her faulty Replacement 4T65 transmission. This proved to be a failed fix.

23. On or about July 15, 2009, after less than 48,000 miles since installation of the Replacement 4T65 transmission, Henderson's vehicle suffered a catastrophic transmission failure that required replacing or rebuilding the faulty Replacement 4T65 transmission due to the defective vehicle design. As a result of the transmission problem, Plaintiff had her Replacement 4T65 transmission completely overhauled and rebuilt by a specialty transmission service center in North Carolina where she paid approximately $3,643.04 for the service.

24. Plaintiff Henderson has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the transmission problem, including, but not limited to, out of pocket loss associated with multiple catastrophic transmission failures and attempted repairs in her class vehicle.

25. None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of Defendants' omissions and/or

misrepresentations related to the transmission problem and/or defective vehicle design.

## B.    Plaintiff Kulon.

26.    Plaintiff Kristina Kulon ("Kulon") is a resident and citizen of the Commonwealth of Massachusetts residing at 4 Edwards Road in the city of Westhampton.

27.    Kulon purchased a 2003 model Volvo XC90 T6 equipped with a 4T65 transmission in or around May of 2007 within the Commonwealth of Massachusetts.  At the time of purchase, her vehicle's odometer registered approximately 48,500 miles.

28.    Plaintiff Kulon purchased (and still owns) this vehicle for personal, family and/or household uses.  Plaintiff Kulon's vehicle bears Vehicle Identification Number: YV1CZ91H631018684.

29.    In or around August 2009, with approximately 85,710 total miles, the "transmission service urgent" alert displayed inside her vehicle.  As a result, she paid approximately $45.00 to have the vehicle towed to Pioneer Volvo ("Pioneer"), an authorized Volvo dealership in South Deerfield, Massachusetts.

30.    Pioneer advised Kulon that they would perform a "Glycol

test," which was designed to determine if the transmission fluid in her vehicle had been contaminated with engine coolant.  If no engine coolant contamination was present then Pioneer recommended flushing the transmission system and performing a TCM software upgrade.

31.    Kulon's vehicle passed the Glycol test whereby her vehicle underwent the above recommended transmission fluid flush service and TCM software upgrade.  She incurred charges of approximately $436.57 as a result of the TCM software upgrade, transmission fluid flush, Glycol test, and diagnosis of the defective vehicle design.

32.    Kulon's vehicle was again road tested by Volvo technicians at Pioneer after the above service was performed.  During the third road test, the "transmission service urgent" alert displayed inside her vehicle.  Upon the technician's further investigation, heavy clutch debris and small metallic debris were found inside the transmission pan of Kulon's vehicle as a result of the defective vehicle design.  These findings necessitated the replacement of the failed 4T65 transmission, transmission cooling system, radiator, and auxiliary cooler in Kulon's vehicle.  Kulon has not been provided with any written warranty from Volvo or an authorized Volvo dealer regarding these replacement parts.

33.    Defendant, Volvo NA ultimately covered the replacement of the transmission and affected components in Kulon's vehicle under their "Goodwill" program.  However, Kulon paid approximately $481.57 for flushing the transmission fluid, upgrading the TCM software, vehicle diagnosis related to the defective vehicle design, and towing charges for transporting her inoperable vehicle to the Volvo dealership as a result of the defective vehicle design.

34.    Plaintiff Kulon has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the transmission problem, including, but not limited to, out of pocket loss associated with a catastrophic transmission failure and attempted repairs in her class vehicle.

35.    Volvo has also neglected to provide Plaintiff Kulon with any form of written warranty pertaining to her replacement transmission and affected components.  Additionally, Volvo had failed to recognize the existence of any such warranty should Plaintiff Kulon's replacement parts fail again due to the defective vehicle design.

36.    None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of Defendants' omissions and/or

misrepresentations related to the transmission problem and/or defective vehicle design.

## C.     Plaintiff Morby.

37.     Plaintiff Ben David Morby ("Morby") is a citizen of the State of Florida residing at 5895 40th Lane in the city of Vero Beach.

38.     Morby purchased a 2003 model Volvo XC90 T6 equipped with a 4T65 transmission in or around August of 2008 from RPM Motors of Space Coast in Pompano Beach, Florida.  At the time of purchase, his vehicle's odometer registered approximately 59,000 miles.

39.     Plaintiff Morby purchased (and still owns) this vehicle for personal, family and/or household uses.  Plaintiff Morby's vehicle bears Vehicle Identification Number: YV1CZ91H631002565.

40.     In or around May 2009, with only 73,800 total miles, the "transmission service urgent" alert displayed inside his vehicle due to the defective vehicle design.  As a result, he paid approximately $101.90 to have the vehicle diagnosed at Vero Beach Mitsubishi ("Vero Beach") in Florida, an automotive dealership offering Volvo servicing.  Based upon dealer service records, the transmission in Morby's vehicle stayed in third gear at all times (Limp Mode) and thereby Vero Beach

recommended replacing or rebuilding the failed transmission.

41.    Plaintiff Morby then contacted Defendant Volvo NA for assistance in the cost of repairing or replacing his vehicle's transmission through Volvo's "Goodwill" program.  Volvo NA required Plaintiff Morby to undergo vehicle diagnosis at The Imported Car Store ("ICS"), a Volvo authorized dealership and service center in Florida.

42.    In or around June 2009, the "transmission service urgent" alert again displayed inside his vehicle due to the defective vehicle design.  As a result, and at the direction of Defendant Volvo NA, he paid approximately $233.20 to have the vehicle diagnosed by ICS.  Based upon service records, ICS found that the transmission in Morby's vehicle stayed in third gear at all times (Limp Mode).  Volvo NA declined to assist Plaintiff Morby in any fashion with the cost of repairing or replacing his failed transmission.

43.    As a result of Defendant's unwillingness to assist in the cost of repairing the defective vehicle design and resulting transmission failure, Plaintiff Morby had his vehicle's 4T65 transmission completely overhauled and rebuilt by a specialty import service center in Vero Beach, Florida.  This specialty import service center found Plaintiff

Morby's vehicle contained a "GM transmission that [was] of poor quality."  Morby paid ICS approximately $4,583.60 for service related to the transmission failure.

44.    Plaintiff Morby has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the transmission problem, including, but not limited to, an out of pocket loss associated with a catastrophic transmission failure and attempted repairs in his class vehicle.

45.    None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of Defendants' omissions and/or misrepresentations related to the transmission problem and/or defective vehicle design.

**D.    Plaintiff Robinson**

46.    Plaintiff Jason Robinson ("Robinson") is a resident and citizen of the State of New Jersey residing at 111 Dora Avenue in the city of Waldwick.

47.    Robinson purchased a new 2005 model Volvo XC90 T6 equipped with a 4T65 transmission in or around December 2004 from

Ramsey Volvo in Ramsey, New Jersey. [4]

48.    Plaintiff Robinson purchased (and still owns) this vehicle for personal, family and/or household uses.  Plaintiff Robinson's vehicle bears Vehicle Identification Number: YV1CZ911551137610.

49.    In or around September 2009 while traveling away from home, with approximately 66,600 miles, the "transmission service urgent" alert displayed inside his vehicle.  Volvo NA directed Plaintiff Robinson to Joe Alcoke Auto & Truck Center ("Joe Alcoke") in New Bern, North Carolina for servicing. [5]  As a result, he paid approximately $81.90 to Joe Alcoke for diagnosing the failed 4T65 transmission in his vehicle.  Based upon service records, Robinson's transmission was noted to have been slipping in all gears.  The technician recommended replacing the transmission and affected components at a cost of $4,600.00.  Robinson declined this service and contacted Defendant

---

[4] Ramsey Volvo claims to have one of Northern New Jersey's largest selections of New Volvo models, Used Volvos and Certified Pre-Owned Volvo vehicles from cars and trucks to vans and SUVs.  They advertise as providing high quality Volvo Sales, Volvo Service, Volvo Parts and Volvo Financing to customers from all across the NY, NJ, and CT tri-state area.

[5] Joe Alcoke Auto & Truck Service markets itself as the "premier and nearly ONLY VOLVO DEALER in Eastern, NC." (emphasis in original); http://www.joealcokevolvo.com

Volvo NA.

50.    Robinson spoke to "Ann" at Volvo NA about the transmission failure in his vehicle.  Ann requested that Robinson bring his vehicle to a local Volvo dealer for diagnosis.  As a result, Robinson surrendered his vehicle to Ramsey Volvo to undergo the required transmission diagnostics.

51.    Based upon dealer service records, Ramsey Volvo diagnosed Robinson's vehicle as having "internal transmission failure" with metal chunks in the transmission pan.  Robinson's vehicle required the transmission, oil cooler, radiator, transmission cooler, oil lines and associated components to be replaced.  Robinson has not been provided with any written warranty from Volvo or an authorized Volvo dealer regarding these replacement parts.

52.    Defendant, Volvo NA ultimately covered the replacement of the transmission and affected components in Robinson's vehicle under their "Goodwill" program due to the defective vehicle design.  However, Robinson paid approximately $336.42 for the initial diagnosis of his failed transmission and rental car fees during the time period his vehicle was undergoing the transmission replacement.

53.     Plaintiff Robinson has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the transmission problem, including, but not limited to, out of pocket loss associated with a catastrophic transmission failure and attempted repairs in his class vehicle.

54.      Volvo has neglected to provide Plaintiff Robinson with any form of written warranty pertaining to his replacement transmission and affected components.  Additionally, Volvo had failed to recognize the existence of any such warranty should Plaintiff Robinson's replacement parts fail again due to the defective vehicle design.

55.     None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of Defendants' omissions and/or misrepresentations related to the transmission problem and/or defective vehicle design.

**E.     Plaintiff Leet**

56.     Plaintiff John Leet ("Leet") is a resident and citizen of the State of Washington residing at 4909 Dubois Drive in the city of Vancouver.

57.     Leet purchased a pre-owned 2004 model Volvo XC90 T6

equipped with a 4T65 transmission in or around January 2007 from Ron Tonkin Acura in Portland, Oregon.  At the time of purchase, his vehicle's odometer registered approximately 65,069 miles.

58.     Plaintiff Leet purchased (and still owns) this vehicle for personal, family and/or household uses.  Plaintiff Leet's vehicle bears Vehicle Identification Number: YV1CZ91H041055554.

59.     In or around August 2009, with approximately 97,000 miles on Leet's vehicle, the "transmission service urgent" alert displayed inside his vehicle.  Leet took his vehicle to Volvo Marin ("Marin"), an authorized Volvo dealership and service center in Corte Madera, California for diagnosis of his transmission issues.

60.     A service technician at Marin advised Leet that they would perform a Glycol test to determine if the transmission fluid in his vehicle had been contaminated with engine coolant.  Leet's vehicle passed the Glycol test.

61.     Based upon service records of Marin, initial road testing confirmed the "1-2 shift" was very sluggish.  A TCM software upgrade was installed and the shifts were reported to be slightly better "but not as good as it should be" according to the Marlin service technician.

62.     Plaintiff Leet incurred charges of approximately $349.70 as a result of the TCM software upgrade, Glycol test, and diagnosis of the defective vehicle design.  As of this date, his vehicle remains in a condition unsafe for usual and customary operation thereby requiring repair of the defective vehicle design.

63.     Plaintiff Leet has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the transmission problem, including, but not limited to, out of pocket loss associated with a catastrophic transmission failure and attempted repairs in his class vehicle.

64.     None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of Defendants' omissions and/or misrepresentations related to the transmission problem and/or defective vehicle design.

## F.     Plaintiff Morris.

65.     Plaintiff Kevin Morris ("Morris") is a resident and citizen of the State of California residing at 100 Sir Francis Drake Boulevard in the city of Ross.  Morris purchased a new 2004 model Volvo XC90 T6 equipped with a 4T65 transmission in or around April 2004 from

McKevitt Volvo, an authorized dealership located in Berkley, California.

66.    Plaintiff Morris purchased (and still owns) this vehicle for personal, family and/or household uses.  Plaintiff Morris' vehicle bears Vehicle Identification Number: YV1CZ91H441107476.

67.    In or around July 2008, with approximately 65,345 total miles, the "transmission service urgent" alert displayed inside his vehicle.  As a result, Plaintiff Morris had his vehicle towed to Turner Volvo ("Turner"), an authorized Volvo dealership in Sacramento, California for diagnosis.

68.    Turner reported that the transmission in Plaintiff Morris's vehicle had suffered internal failure.  Defendant, Volvo NA ultimately covered only the transmission replacement parts for Morris's vehicle under their "Goodwill" program.  Morris paid approximately $990.69 to Turner for labor costs related to the transmission replacement.

69.    Plaintiff Morris has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the transmission problem, including, but not limited to, out of pocket loss associated with a catastrophic transmission failure and attempted repairs in his class vehicle.

70.    Volvo has also neglected to provide Plaintiff Morris with any form of written warranty pertaining to his replacement transmission and affected components.  Additionally, Volvo had failed to recognize the existence of any such warranty should Plaintiff Morris' replacement parts fail again due to the defective vehicle design.

71.    None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of Defendants' omissions and/or misrepresentations related to the transmission problem and/or defective vehicle design.

**The Defendants**

72.    Defendant Volvo NA, is a corporation organized and existing under the laws of the State of New Jersey, having a principal place of business at 1 Volvo Drive, Rockleigh, New Jersey 07647, and, for purposes of 28 U.S.C. § 1441(b), is a citizen of the State of New Jersey.

73.    Defendant Volvo CC is a Swedish corporation headquartered at SE-405 31 Gothenburg, Sweden.

74.    Upon information and belief, Defendant Volvo NA communicates with Defendant Volvo CC concerning virtually all aspects of the Volvo products it distributes within the United States.

75.    Upon information and belief, the design, modification, installation and decisions regarding the 4T65 transmission within the class vehicles were performed exclusively by Defendant(s) Volvo NA and/or Volvo CC.

76.    Upon information and belief, Defendants Volvo NA and/or Volvo CC develop the owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for class vehicles.

77.    Defendants Volvo NA and Volvo CC engage in continuous and substantial business in New Jersey.

## TOLLING OF STATUTES OF LIMITATION

78.    Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and members of the class could not have reasonably discovered the true, latent defective nature of the XC90 and 4T65 transmission until shortly before this class action litigation was commenced.

79.    Defendants were and remain under a continuing duty to disclose to Plaintiff and members of the class the true character, quality

and nature of the XC90 equipped with the 4T65 transmission, that this

defect is based on a poor design, and that it will require costly repairs to

fix and diminishes the resale value of the Class vehicles.  As a result of

the active concealment by Defendants, any and all applicable statutes of

limitations otherwise applicable to the allegations herein have been

tolled.

## FACTUAL ALLEGATIONS

### A.   The Defective Vehicle Design and Transmission Problem with the Class Vehicles.

80.   Defendants first introduced the mid-size luxury XC90

production SUV as a 2003 model year vehicle.  At the time, the XC90

was offered with a choice of two engines: the "2.5T," an in-line 5

cylinder turbocharged engine rated at 205 hp and 236 ft-lbs of torque,

and the high output "T6," a 6 cylinder twin-turbocharged engine rated

at 268 hp and 280 ft-lbs of torque ("T6").[6]  The T6 model was only

available with All-Wheel Drive ("AWD").

81.   Due to the design of the T6 engine with AWD, Defendants

could not use the same 5 speed automatic transmission that had been

---

[6] Volvo states the T6 engine (a/k/a B6294T) produces 268 hp at 5100 rpm and 280 ft-lbs of torque between 1800-5000 rpm. *See* 2004 Volvo XC90 Owner's Manual, p.156.

coupled to the 2.5T engine.  Instead, Volvo equipped the T6 models with a GM sourced, and Volvo modified 4T65 automatic transmission (*see* diagram below).[7]



82.     Defendants offered the T6 engine and 4T65 transmission combination on XC90 model years 2003 through 2005.  Both the T6 engine and 4T65 transmission were no longer offered on the XC90 platform after the 2005 model year.

83.     Defendants' factory maintenance schedules for the 2003 and 2004 XC90 T6 equipped with the 4T65 transmission did not require or recommend having the transmission fluid flushed or changed during the lifetime of the vehicle unless the vehicle was used for towing.  In 2005, Volvo maintained the same lifetime free maintenance pertaining to the XC90 with the 4T65 transmission but added the possibility of requiring transmission fluid changing when a message displayed in the

---

[7] Image used by Volvo in XC90 specific Technical Service Bulletins.

Instrument Panel Text Window.

84.    Volvo, in an effort to alert XC90 owners, provided a list of items on the outside back cover of the XC90 Owner's Manual that "should be checked regularly."[8]  Neither the transmission nor transmission fluid level were included by Volvo as items that should be checked regularly (*see* image below).



85.    Instead, Volvo recommends that consumers, *via* the Warranty and Service Records Information and not the Owner's Manual, check the automatic transmission fluid levels only if an external leak is identified, and to change transmission fluid every

---

[8] *See* 2004 Volvo XC90 Owner's Manual, outside back cover.

52,500 miles *only on vehicles used for towing*. (*see* images below).[9]

Upon information and belief, Volvo has since notified Volvo dealers that the 4T65 transmission fluid should be changed every 30,000 miles regardless of whether the vehicle is used for towing.

## Maintenance Service Operations

**Service Operation**  —  **Schedule of Services**

### All 2004 Models*

| Service Operation | miles x 1000 | 7.5 | 15 | 22.5 | 30 | 37.5 | 45 | 52.5 | 60 | 67.5 | 75 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | km x 1000 | 12 | 24 | 36 | 48 | 60 | 72 | 84 | 96 | 108 | 120 |
| **Steering, Front and Rear Suspension** | | | | | | | | | | | |
| Power steering fluid level, check/adjust | | X | X | X | X | X | X | X | X | X | X |
| Steering/front suspension, check | | | | | | | | | X | X | X |
| Rear suspension, check for wear | | | | | | | | | X | X | X |
| **Transmission, Driveshaft and Differential** | | | | | | | | | | | |
| Automatic transmission fluid level, check/adjust** | | | | | | | | | | | |
| Bevel gear, visual inspection† | | | X | | X | | X | | X | | X |
| Driveshaft joints, check for wear/play | | | | | | | | | X | X | X |
| Driveshafts, check boots | | | | | | | | | X | X | X |
| Propeller shaft, pilot bearing and universal joints, check wear† | | | | | | | | | X | X | X |
| **Controls and Lighting** | | | | | | | | | | | |
| Exterior lighting controls, check | | | X | | X | | X | | X | | X |
| Washer fluid level, check/adjust | | X | X | X | X | X | X | X | X | X | X |
| Check all wiper blades | | X | X | X | X | X | X | X | X | X | X |

\*   This maintenance chart continues on page 63.
\*\*  Check automatic transmission fluid level only if an external leak is identified. Volvo recommends changing automatic transmission fluid every 52,500 miles/84,000 kilometers, only on vehicles used for towing.
†   All-wheel drive models only.

*Service Information*

---

[9] *See* 2004 XC90 Warranty and Service Records Information, pgs. 62-63 (emphasis added).

## Maintenance Service Operations

| Service Operation **All 2004 Models Cont..** | Schedule of Services | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| miles x 1000 | 82.5 | 90 | 97.5 | 105 | 112.5 | 120 | 127.5 | 135 | 142.5 | 150 |
| km x 1000 | 132 | 144 | 156 | 168 | 180 | 192 | 204 | 216 | 228 | 240 |
| **Steering, Front and Rear Suspension** | | | | | | | | | | |
| Power steering fluid level, check/adjust | X | X | X | X | X | X | X | X | X | X |
| Steering/front suspension, check | X | X | X | X | X | X | X | X | X | X |
| Rear suspension, check for wear | X | X | X | X | X | X | X | X | X | X |
| **Transmission, Driveshaft and Differential** | | | | | | | | | | |
| Automatic transmission fluid level, check/adjust** | | | | | | | | | | |
| Bevel gear, visual inspection† | | X | | X | | X | | X | | X |
| Driveshaft joints, check for wear/play | X | X | X | X | X | X | X | X | X | X |
| Driveshafts, check boots | X | X | X | X | X | X | X | X | X | X |
| Propeller shaft, pilot bearing and universal joints, check wear† | X | X | X | X | X | X | X | X | X | X |
| **Controls and Lighting** | | | | | | | | | | |
| Exterior lighting controls, check | | X | | X | | X | | X | | X |
| Washer fluid level, check/adjust | X | X | X | X | X | X | X | X | X | X |
| Check all wiper blades | X | X | X | X | X | X | X | X | X | X |

** Check automatic transmission fluid level only if an external leak is identified. Volvo recommends changing automatic transmission fluid every 52,500 miles, only on vehicles used for towing.

† All-wheel drive models only.

Service Information

86.    Upon information and belief, Defendants incorporated computer programming and/or control of the 4T65 transmission into the 2003 – 2005 T6 models through the use of, *inter alia*, the Transmission Control Module ("TCM") located within the engine compartment (*See* figure below).[10]



This combination proved to be inappropriate as it caused, in part,

---

[10] Image used by Volvo in XC90 specific Technical Service Bulletins.

delayed shift patterns, excessive heat buildup, slippage, harshness, premature clutch wear, metal debris and catastrophic transmission failure.

87.   Upon information and belief, Volvo issued Technical Service Bulletin ("TSB") No. 40-02 on or about December 2007 addressing both the TCM and Differential Electronic Modules ("DEM") in models years 2003–2005 of the XC90 equipped with the GM4T65 transmission.  This TSB provided a TCM and DEM software update to resolve complaints of "1-2 Upshift Quality: Slipping, Harshness, Delay, Hesitation" and "2-1 Downshift Shock" in the class vehicles.

88.   Upon information and belief, on or about March 2009, Volvo issued a successive TSB for TSB No. 40-02.  This TSB provided a software update to resolve those complaints listed in TSB No. 40-02 pertaining to the 4T65 transmission issues in the class vehicles.

89.   Upon information and belief, Volvo performed modifications of the 4T65 transmission specifically tailored to the T6 model, including, but not limited to, modification of the valve body and internal hard parts in order to accommodate the high output T6 engine with the accompanying heavy vehicle weight and AWD.  Defendants also

included a hollow front axle design on the T6 model allowing for potential transmission fluid contamination and resulting transmission failure.  These modifications and designs caused, in part, delayed shift patterns, excessive heat buildup, slippage, harshness, premature clutch wear, metal debris (*see* picture below),[11] transmission fluid contamination by axle fluid, differential fluid, and/or engine coolant, and catastrophic transmission failure.



90.    Upon information and belief, Volvo incorporated an inadequate design and inappropriate application of the 4T65 transmission contained within the class vehicles by allowing transmission fluid contamination by axle fluid, differential fluid, and/or engine coolant, causing, in part, delayed shift patterns, excessive heat buildup, slippage, premature clutch wear, metal debris and catastrophic

[11] Image used by Volvo in XC90 specific Technical Service Bulletins.

transmission failure.

91.    Upon information and belief, Defendants' use of the defective 4T65 transmission in the T6 caused transmission slippage, premature clutch wear, fluid contamination, internal metal debris, and overheating ultimately resulting in catastrophic failure of the transmission within the class vehicles.

92.    Transmissions are designed to function for periods (and mileages) substantially in excess of those specified in Defendants' warranties, and given past experience, consumers legitimately expect to enjoy the use of an automobile without worry that the transmission would fail for significantly longer than the limited times and mileages identified in Defendants' warranties.[12]

93.    Upon information and belief, Defendants, through (1) their own records of customers complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration (NHTSA), and (4) other various sources, were well aware of the

---

[12] Volvo offers membership into the Volvo High Mileage Club for those Volvo owners whose odometers read 100,000 miles or more. The current record holder of the Volvo High Mileage Club has driven his 1966 Volvo P1800 over 2.7 million miles with the original Volvo transmission. http://www.volvocars.com/us/tools/OwnersInfo/Pages/VolvoOwners.aspx

alarming failure rate of the 4T65 transmissions but failed to notify customers of the nature and extent of the problems with the 4T65 transmission and failed to provide any adequate remedy.

94.   Members of the class could not have discovered the latent 4T65 transmission defects through any reasonable inspection of their vehicles prior to purchase.

95.   Volvo prides itself on the quality and safety of its vehicles. Volvo touts on its website:[13]

> *Scandinavians value things that last. So perhaps it's just in our nature that every aspect of a Volvo's construction is designed to make it an incredibly durable car.*

96.   In September 2008, Volvo CEO Stephen Odell was quoted as saying, "Volvo is one of the great iconic automotive brands," while "[t]he very attributes that make Volvo distinctively Swedish – its heritage of safety, environmental concern and its Scandinavian design – appeal to customers around the globe []."[14]

97.   Volvo has also made the claim in numerous press releases

---

[13] http://www.volvocars.com/us/experience/Pages/quality.aspx
[14] http://www.motorauthority.com/blog/1022962_volvo-gets-new-ceo-amid-rumors-of-sale-and-multi-million-dollar-losses

that "Quality is a fundamental principle for everything we do at Volvo.
We have a long history of reliability and a commitment to quality and it
is vital that products and services that bear the Volvo name not only
achieve but preferably surpass our customers [sic] expectations."

98.    In addition, Volvo has publicly explained that the
"company's operations should be based on care for human beings.
Safety, quality, reliability and responsibility are the core of our
operations, our products and our behavior."[15]

99.    Volvo has marketed the XC90 in particular as a near
"…perfect balance of design, capability, and safety engineering."[16]
Additionally, Volvo states "[I]n a Volvo XC90, the powertrain and
chassis interact to provide a harmonious balance between response and
comfort."[17]

100.  Contrary to the experience of each of the Plaintiffs and
members of the class, Volvo advertises the XC90 as a pleasure to own

_____

[15]
https://media.volvocars.com/download/media/articles/doc/10828_2_1.aspx.
[16] 2003 Volvo XC90 Sales Brochure, p.5; 2004 Volvo XC90 Sales
Brochure, 2nd Edition, p.2; 2005 Volvo XC90 Sales Brochure, p.3.
[17] 2004 Brochure at p.28.

by providing a "harmonious ownership experience"[18] when in fact Volvo knew or had reason to believe that the 4T65 transmission was prone to design defects and premature failure.  Indeed, nowhere in these affirmative statements about the high quality of these luxury automobiles does Volvo disclose or mention the transmission design defects.

101.  Volvo has also marketed its ability to maintain and/or repair the XC90 as superior to other service options.  Volvo advertises to consumers of the XC90 that "[G]enuine Volvo Service is our ongoing commitment to you: to keep your Volvo performing smoothly long after other cars have given up."[19]  This statement is contrary to the experience of Plaintiffs and members of the class, whose complaints directly to Volvo show that it knew or had reason to believe that the 4T65 transmission was prone to design defect and ultimate failure.

102.  Defendants failed to adequately research, design, test and/or manufacture the 4T65 transmission before warranting, advertising, promoting, marketing, and selling it as suitable and safe for use in an intended and/or reasonably foreseeable manner.

---

[18] 2003 Brochure at p.43.
[19] 2005 Brochure at p.43.

103.  Defendants expressly warranted the affected vehicles to be free from defects for a period of 4 years or 50,000 miles.

104.  Buyers, lessees, and other owners of the affected vehicles were without access to the information concealed by Defendants as described herein, and therefore reasonably relied on Defendants' representations and warranties regarding the quality, durability, and other material characteristics of their vehicles.  Had these buyers and lessees known of the defect and the potential danger, they would have taken steps to avoid that danger and/or would have paid less for their vehicles than the amounts they actually paid, or would not have purchased the vehicles.

## B.   Complaints by Other Class Members.

105.  Plaintiffs' experiences are by no means isolated or outlying occurrences.  Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same transmission problem with the class vehicles.[20]

---

[20]  *See, e.g.,*
http://volvoforums.com/forum/showthread.php?t=7573&page=3;
http://www.volvo-forums.com/t25063-xc-90-t6-transmission.htm; and

106.   Owners of the class vehicle have publicly complained to the United States government about the transmission problems they experienced in the 2003-2005 XC90 T6.  The Office of Defects Investigation (ODI) is an office within the National Highway Traffic Safety Administration (NHTSA).  ODI conducts defect investigations and administers safety recalls to support the NHTSA's mission to improve safety on the Nation's highways.  The following are just some of the many complaints submitted to ODI by owners of the Volvo XC90 model years 2003 – 2005.  These complaints evidence the negative experience encountered by XC90 owners with their transmissions beginning in as early as the year 2003:[21]

> **ODI ID Number** : 10041548
> **Date of Failure:** October 7, 2003
> **Model:** 2003 XC90
> **Summary:**
> WE BOUGHT A 2003 VOLVO XC 90 IN JANUARY 2003, THE VEHICLE IS LESS THAN A YEAR OLD AND HAS ABOUT 12,600 MILES. IN THE LAST SIX WEEKS, WE HAVE HAD FOUR SYSTEM PROBLEMS, BRAKES, CRUISE CONTROL, AC/ DEFROSTER AND MOST

---

http://74.125.155.132/search?q=cache:Eiig72CvrgMJ:www.consumeraffairs.com/automotive/volvo.htm+volvo+xc90+transmission+problems&cd=7&hl=en&ct=clnk&gl=us
http://townhall-talk.edmunds.com/WebX/.f18a651?displayRecent
http://www.carsurvey.org/reviews/volvo/xc90/r69842/comments/page-10/
[21] http://www-odi.nhtsa.dot.gov/tsbs/

RECENTLY AUTOMATIC TRANSMISSION. I BELIEVE THAT THE TRANSMISSION IS THE MOST SERIOUS PROBLEM SINCE IT FAILED TO OPERATE WHILE MY WIFE WAS DRIVING ON THE HIGHWAY.THE DEALER REPAIRED THE VEHICLE STATING THAT A CORRUPT SOFTWARE WAS THE CAUSE. VOLVO USA STATED THAT THE "NEW" SOFTWARE WAS A MODIFICATION/UPGRADE WHICH IS BEING PUT IN THE 2004 VEHICLES. MY QUESTION TO VOLVO USA AS TO WHETHER THIS PROBLEM WITH THE 2003 CAUSED THE DESIGN OF THE MODIFICATION WAS NOT AN ADEQUATELY RESPONDED TO. VOLVO USA CLAIMED THAT THERE WERE NO FIGURES AVAILABLE TO ADVISE MYSELF ON HOW MANY 2003 XC 90 HAVE HAD THIS OR OTHER PROBLEMS. I ADVISED VOVLO USA THAT WE ARE VERY DISSATISFIED WITH THE QUALITY AND SAFETY OF THIS VEHICLE. *LA

**ODI ID Number** : 10288748
**Model:** 2003 XC90
**Date of Failure:** October 16, 2009
**Summary:**
TRANSMISSION SERVICE URGENT LIGHT. THE TRANSMISSION HAD TO BE REPLACE. THIS IS A KNOWN PROBLEM WITH THIS TYPE OF SUV FROM VOLVO THE 2003 XC90. THE DEALER ARE ONLY REPLACING THE TRANS AT OUTRAGES PRICE SOME AS MUCH AS 8000.00. IF THIS IS A KNOW PROBLEM WHY WILL VOLVO NOT HAVE A RECALL. THIS IS THE THIRD VOLVO THAT I HAVE OWN. *TR

**ODI ID Number** : 10270208
**Date of Failure:** May 22, 2009
**Model:** 2003 XC90
**Summary:**
THE TRANSMISSION (WITHOUT WARNING) IN MY 2003 VOLVO XC90 T6 WENT OUT (NO REVERSE & WONT

SHIFT OUT OF 3RD GEAR). IT IS AN AUTOMATIC.
THERE ARE MANY OWNERS OF THIS VEHICLE WHO
HAVE EXPERIENCED THE SAME PROBLEM IT HAS
BEEN INDEPENDENTLY DIAGNOSED AS A DEFECT
WITH THE PARTICULAR TRANSMISSION THAT VOLVO
CHOOSE TO PUT IN THIS MODEL VEHICLE. MOST
OWNERS HAVE BEEN TOLD BY DEALERS THERE IS
NOTHING THAT CAN BE DONE FOR THEM (MOST
PROBLEMS OCCUR BETWEEN 40 - 60,000 MILES & ARE
OUT OF WARRANTY) EXCEPT SELL THEM A NEW OR
REBUILT TRANSMISSION (APPROX. $5,000). MY
VEHICLE HAS 75K MILES & I HAVE MY VEHICLE AT A
REPAIR SHOP WAITING TO SEE WHAT MY OPTIONS
ARE. I HAVE BEEN TOLD BY TWO MECHANICS THAT
THE TRANSMISSION NEEDS TO BE REPLACED. *TR

**ODI ID Number :** 10269627
**Date of Failure:** May 9, 2009
**Model:** 2003 XC90
**Summary:**
I OWN A 2003 VOLVO XC90 T6. THE TRANSMISSION
FAILED ONCE AT 66,000 MILES AND WAS REPLACED.
AT THAT TIME VOLVO PAID 50% OF THE COST. MY
COST WAS $2,700. IT HAS NOW FAILED AGAIN AT
107,000 AND IS NOW AWAITING ITS THIRD
TRANSMISSION. I HAVE FILED A COMPLAINT AT
VOLVO CUSTOMER SERVICE ON THE WEBSITE .
VOLVO IS OFFERING TO PROVIDE THE PARTS IF I PAY
FOR THE LABOR. THE CAR FAILED ON THE NEW
YORK TURNPIKE CREATING A DANGEROUS, SCARY
SITUATION. THE CAR WAS TOWED TO A VOLVO
DEALER IN ALBANY, NY. I LIVE IN COLUMBUS OHIO. I
NEEDED TO RENT A CAR @ A COST OF $355 TO
RETURN TO COLUMBUS. THE CAR IS IN ALBANY
AWAITING REPAIR. I HAVE RECEIVED A CALL FROM
BETTY WITH VOLVO, TELEPHONE 800-458-1552 X 1977.
VOLVO WILL COVER THE PARTS IF I COVER LABOR.
THE LABOR WILL COST $1,800. I WILL ALSO NEED TO

INCUR THE COST OF A PLANE TICKET TO RETURN
TTO ALBANY. DUE TO THE HIGH COSTS I WILL NEED
TO INCUR TO FIX THE CAR UNDER VOLVO¿S
CURRENT OFFER, I WOULD LIKE TO CONSIDER MY
OPTIONS. THANKS VERY MUCH FOR YOUR HELP IN
THIS MATTER. *TR

**ODI ID Number :** 10268885
**Date of Failure:** April 1, 2008
**Model:** 2003 XC90
**Summary:**
THE VOLVO XC90 T6 MODEL HAS A SIGNIFICANT
SAFETY ISSUE WITH THE TRANSMISSION. MY 2003
XC90 T6 WITH LESS THAN 65K MILES ON IT HAD THE
TRANSMISSION FAIL. I WAS DRIVING DOWN A
LIMITED ACCESS HIGHWAY (HWY100 IN
MINNEAPOLIS) WHEN THE TRANSMISSION FAILED. I
COULD NOT DRIVE OVER 30 MPH ON THIS FAST
MOVING HIGHWAY. IN RESEARCHING THIS
PROBLEM, IT IS PAINFUL CLEAR THAT THIS MODEL
HAS AN EXTENSIVE HISTORY OF TRANSMISSION
FAILURES. TIME AND TIME AGAIN T6 OWNERS ARE
HAVING TO REPLACE TRANSMISSIONS SOMETIMES
TWICE WITH LESS THAN 120K MILES ON THEIR
VEHICLES. VOLVO IS NOT STEPPING UP TO TAKE
RESPONSIBILITY. IT IS GOING TO TAKE AN ACCIDENT
OR GOD FORBID INJURY OR DEATH FOR THEM TO
ACKNOWLEDGE THIS PROBLEM. *TR

**ODI ID Number :** 10260371
**Date of Failure:** December 31, 2008
**Model:** 2003 XC90
**Summary:**
MY 2003 VOLVO XC90'S TRANSMISSION WENT OUT
JUST TEN DAYS AFTER THE WARRANTY EXPIRED.
VOLVO CUSTOMER SERVICE OFFERED A GOOD FAITH
REPAIR BUT STILL COST ME SEVERAL THOUSAND
OUT-OF-POCKET IN REPAIR COSTS. SIX WEEKS

AFTER REPAIR, I HAVE A PUDDLE ON MY GARAGE
FLOOR. THIS PROBLEM, WITH THE T6
TRANSMISSION, IS RATHER COMMON AND WELL-
DOCUMENTED. IF THE PROBLEM IS SO PREVALENT,
WHY IS THERE NOT A FULL RECALL OR BETTER FIX?
I AM NOT SATISFIED WITH THIS CAR. *TR

**ODI ID Number** : 10259612
**Date of Failure:** February 1, 2009
**Model:** 2003 XC90
**Summary:**
RECEIVED A TRANSMISSION URGENT SERVICE
WARNING LIGHT. TOOK THE CAR TO DEALER AND
THEY STATED I NEED A NEW TRANSMISSION. CAR
HAS 62,000 MILES AND HAS ALWAYS BEEN SERVICED
AT VOLVO. I DID A SEARCH ONLINE AND FOUND
OVER 200 COMPLAINTS OF THE SAME FAILURES I
STATED. VOLVO WOULD NOT COVER THE REPAIRS
UNDER WARRANTY. *TR

**ODI ID Number** : 10289142
**Date of Failure:** October 19, 2009
**Model:** 2004 XC90
**Summary:**
VOLVO - 2004 XC90 T6 AWD. CAR EXPERIENCING
HESITATION, GETS LOCKED IN EITHER 1ST OR 4TH
GEAR. REPEAT TRIPS TO SERVICE, NONE OF WHICH
CORRECTED THE ISSUE. COMPLETE TRANSMISSION
FAILURE REQUIRING REPLACEMENT TRANSMISSION,
RADIATOR AND FRONT AXLE. APPEARS TO BE
COMMON IN THIS VEHICLE, WITH NO RECOURSE
FROM VOLVO. *TR

**ODI ID Number** : 10262206
**Date of Failure: January 24, 2009**
**Model:** 2004 XC90
**Summary:**
CAR STARTED MAKING A LOUD, METAL GRINDING

SOUND WHILE PULLING OUT OF A SHOPPING
CENTER PARKING LOT. NO PREVIOUS PROBLEMS OR
FAILURES. NO SERVICE CODE. BROUGHT CAR TO
DEALER AND CONFIRMED MY FEAR IT WAS THE
TRANSMISSION. ONLY 69,000 MILES ON CAR. I'VE
BEEN AWARE OF TRANSMISSION PROBLEMS ON
XC90'S. I EVEN HAVE A NEIGHBOR WHO HAD TO
REPLACE THE TRANSMISSION ON HIS 2004 XC90.
HAVE ALWAYS HAD VOLVOS, BUT THIS IS THE LAST
ONE. VOLVO NO LONGER STANDS BEHIND ITS
VEHICLES. VERY DISAPPOINTING FOR THE PRICE
PAID. *TR

**ODI ID Number**: 10255825
**Date of Failure**: January 18, 2009
**Model**: 2004 XC90
**Summary**:
AFTER 60000 MILE SERVICE TRANSMISSION
APPEARED TO BE SLIPPING WHEN COLD.
"TRANSMISSION SERVICE URGENT" MESSAGE
APPEARED. TRANSMISSION WOULD NOT SHIFT FROM
THIRD GEAR. SHOP INDICATED THERE IS NO
ADJUSTABLE PART. TRANSMISSION REPLACEMENT
WOULD LIKELY BE NEEDED, WHEN CONTACTED
VOLVO INDICATED THE WARRANTY WAS OFF AT 55K
MILES. UPON RESEARCHING THROUGH THE
INTERNET THERE ARE AN EXTREMELY LARGE
NUMBER OF TRANSMISSION REPLACEMENTS FOR
THIS VEHICLE AND YET NO RECALL HAS BEEN
ISSUED. I CONTACTED VOLVO OF NORTH AMERICA
AND IT APPEARS THEY ARE DEALING WITH THIS ON
A SQUEAKY WHEEL CASE BY CASE BASIS AND SOME
INDIVIDUALS ARE PAYING FULL REPLACEMENT
COST WHILE OTHERS ARE BEING COVERED BY
VOLVO. THIS DOES NOT SEEM EQUITABLE TO THE
INDIVIDUALS WHO ARE UNABLE TO DO THE
RESEARCH OR HAVE TIME AND RESOURCES TO

CONVINCE VOLVO TO REPLACE THE DEFECTIVE
TRANSMISSIONS GRATIS. *TR

**ODI ID Number :** 10255372
**Date of Failure:** November 28, 2008
**Model:** 2004 XC90
**Summary:**
I HAVE A 2004 VOLVO XC90 T6 AWD SUV THAT I
PURCHASED FROM A VOLVO DEALER. WHILE ON A
CROSS COUNTRY TRIP THE TRANSMISSION SEIZED
AND HAD TO BE REPLACE. THE VEHICLE WAS STILL
UNDER WARRANTY (LUCKY), BUT THE MECHANIC
TOLD ME THAT THIS MODEL AND YEAR HAD A
ENGINEERING FLAW AND HE HAD SEEN A NUMBER
OF THESE WITH THIS SAME PROBLEM. THE FLAW,
THE TURBO ENGINE PUTS TOO MUCH TORQUE ON
THE 4 SPEED GM TRANNY IN THE CAR. I ASKED IF
VOLVO HAD A RECALL ON THIS ISSUE AND HE SAID
NO. THIS FIRST TRANNY WENT OUT AT 60,000. AT 66,
000 MILES THE SECOND TRANNY WENT OUT. WHEN I
ASKED WHY THIS ONE WENT OUT, HE EXPLAINED
THAT THEY DO NOT KNOW B/C WHEN IT IS UNDER
WARRANTY, VOLVO TELLS THE DEALERSHIPS TO
JUST REPLACE IT AND THEN SEND IT TO THEM AND
THEY WILL TRY AND DIAGNOSIS THE PROBLEM. I
HAVE BEEN TOLD THAT SINCE GM DOES NOT MAKE
THE TRANSMISSION ANY LONGER THEY HAVE TO
PUT A REBUILT INTO IT. I HAVE DONE SOME
RESEARCH ON THIS ISSUE AND THERE SEEMS TO BE
100'S OF XC 90 OWNERS WITH THE SAME PROBLEM. I
HAVE CONTACTED VOLVO CUSTOMER SERVICE AND
THEY HAVE BEEN NICE BUT NOT VERY WILLING TO
ADDRESS THIS ISSUE AND I DON'T HAVE VERY MUCH
CONFIDENCE IN THIS RECENT TRANNY. I WAS
LUCKY WHEN THE FIRST ONE WENT OUT, B/C I WAS
NOT DRIVE AT 70 MPH WHEN IT SEIZED, I WAS JUST
GETTING BACK ON THE HWY. THE SECOND ONE
WENT OUT ALSO AT A SLOW SPEED. I SEARCHED

THROUGH YOUR SITE AND DID NOT FIND ANY
MENTION OF THIS ISSUE SO I THOUGHT I WOULD
POST WITH YOU AND SEE WHAT HAPPENED. IF YOU
NEED FURTHER DETAILS PLEASE LET ME KNOW.
THANKS *TR

**ODI ID Number** : 10253527
**Date of Failure:** May 14, 2008
**Model:** 2004 XC90
**Summary:**
AT APPROXIMATELY 62,500 MILES, THE
TRANSMISSION OF MY 2004 VOLVO XC90 FAILED.
AFTER RESEARCHING, I FOUND THIS TO BE A
COMMON PROBLEM FOR THIS PARTICULAR MODEL
CAR, AS WELL AS THE 2003 AND PART OF THE 2005
YEAR. I HAD THE TRANSMISSION REBUILT BY AN
INDEPENDENT TRANSMISSION REPAIR SHOP, THEY
WERE ABLE TO PROVIDE ME ATRA MANUALS, WHICH
I HAVE COPIES OF, THAT SHOWS THE PARTICULAR
DEFECT WITH THE TRANSMISSION WHICH
DEMONSTRATES AS THE DIRECT CAUSE OF WHAT
SEEMS TO BE A COMMON PROBLEM. THAT PROBLEM
IS THAT THE 2ND AND 4TH CLUTCHES ARE BURNING
AND EVENTUALLY SPEWING BITS OF METAL
SHAVINGS THROUGHOUT THE ENTIRE
TRANSMISSION, DESTROYING IT. THE PROBLEM WAS
IDENTIFIED IN THE 2005 ATRA MANUAL AS
SOMETHING TO LOOK OUT FOR AND INSPECT, IN
2006, THE CAUSE WAS IDENTIFIED AS IMPROPER
MACHINING OF THE ACCUMULATOR HOUSING, THE
ANGLE AND DEPTH HAVE NOW BEEN MODIFIED TO
AVOID DAMAGE LIKE MY CAR AND MANY OTHERS
OWNERS LIKE ME HAVE EXPERIENCED. THE
PARTICULAR MODEL IS THE GM 4T65E
TRANSMISSION. NOT ONLY AN INCONVENIENCE, BUT
IN MY OPINION, A SEVERE SAFELY HAZARD, PRIOR
TO THE REPAIRS, THE TRANSMISSION LIGHT CAME
ON AND EFFECTIVELY MADE IT IMPOSSIBLE TO

MANEUVER THE CAR FORCING ME TO PULL OVER
AND ASSESS THE SITUATION, FORTUNATELY FOR
ME, TRAFFIC WAS LIGHT AT THE TIME, THIS MAY
NOT HAVE BEEN THE CASE FOR SOMEONE ELSE,
POTENTIALLY CAUSING AN ACCIDENT AND EVEN
WORSE DEATH OR DISMEMBERMENT. I BELIEVE
VOLVO SHOULD ISSUE A RECALL AND REIMBURSE
OWNERS FOR THE EXPENSE OF A NEW OR REBUILT
TRANSMISSION. *TR

**ODI ID Number :** 10251543
**Date of Failure:** December 8, 2008
**Model:** 2004 XC90
**Summary:**
I HAVE HAD 3 COMPLETE TRANSMISSION FAILURES
IN A VOLVO XC90 T6 WITHOUT WARNING REQUIRING
REPLACEMENT OF THE TRANSMISSION. THE FIRST
TWO FAILED ON THE HIGHWAY ALMOST CAUSING AN
ACCIDENT AS THE TRANSMISSION CUT OUT
COMPLETELY. THE LAST ONCE OCCURRED ON A
BUSY 2 LANE HIGHWAY WHILE MAKING A TURN
ACROSS TRAFFIC. THE FIRST ONE FAILED AT 28,000
MILES, THE SECOND AT 55,000 MILES AND THE
THIRD AT 80,000 MILES. THE FIRST ONE WAS
REPLACED UNDER WARRANTY WITHOUT AN
ARGUMENT, THE 2ND ONE WAS REPLACED UNDER
WARRANTY WITH AN ARGUMENT, AND THE THIRD
ONE VOLVO WON'T EVEN TALK ABOUT REPLACING
FOR FREE AND WANTS TO CHARGE OVER 5K,
WITHOUT GIVING ANY ASSURANCES ANOTHER 25K
WON'T GO BY AND IT WON'T FAIL AGAIN. THEY DON'T
CARE THAT THE "SAFEST" CAR CAN INSTANTLY
BECOME A DEATH TRAP. A TRANSMISSION ISN'T A
DISPOSABLE ITEM THAT SHOULD FAIL EVERY 25K,
THEY SHOULD LAST AT LEAST 100K AND NOT CUT
OUT IN THESE DANGEROUS FASHIONS WITHOUT
WARNING. THE THIRD ONE THERE WEREN'T EVEN
ANY WARNING LIGHTS. THE COMPANY SHOULD FIX

THIS DANGEROUS PROBLEM AT NO COST TO THE OWNERS WITH A SOLUTION THAT GIVES THE TRANSMISSION A LIFE SIMILAR TO OTHER VEHICLES IN IT'S CLASS. THERE ANSWER IS TO PUT ANOTHER ONE IN, KNOWING IT WILL FAIL AND MAYBE KILL YOU. *TR

**ODI ID Number** : 10246804
**Date of Failure:** October 20, 2008
**Summary:**
WHILE DRIVING MY 2004 VOLVO XC-90, THE TRANSMISSION WENT OUT ON THE HIGHWAY AND THE VEHICLE WOULD NOT ACCELERATE. THERE WAS NOT WARNING, AND WE ALMOST GOT INTO A CAR ACCIDENT WITH A TRUCK. MY WIFE IS 8 MONTHS PREGNANT, AND WE WERE VERY SCARED. *TR

**ODI ID Number** : 10240828
**Date of Failure:** August 25, 2008
**Model:** 2004 XC90
**Summary:**
AT 78,000 MILES MY 2004 VOLVO XC90 T6 TRANSMISSION JERKS AND THE "URGENT TRANSMISSION LIGHT" SHINES 25 MILES FROM OUR HOUSE. THE SERVICE CENTER SAYS WE NEED NEW TRANSMISSION $5,200 BUT FOR NOW THEY DROP PAN AND FLUSH. NOT SURE HOW LONG IT WILL LAST. PLUS THEY BILL ME FOR UPGRADING "SOFTWARE" $300+. TRANSMISSION FAILURE IS COMMON DUE TO INADEQUATE DESIGN (GM) RELATIVE TO POWER PLANT IN CAR. THIS IS EPIDEMIC. TRANSMISSIONS DO NOT FAIL AT 25,000 - 90,000 MILES. *TR

**ODI ID Number** : 10235154
**Date of Failure:** July 1, 2008
**Model:** 2004 XC90
**Summary:**

VEHICLE UNABLE TO SHIFT PROPERLY, COMPUTER READING "TRANSMISSION URGENT SERVICE" LOCKS IN THIRD GEAR IN "LIMP MODE". VEHICLE CAUSED VERY NEAR FATAL ACCIDENT WHEN STOPPED ON A HILL AND AFTER INITIALLY MOVING OUT INTO TRAFFIC, SEIZED TO OPERATE. TOWED TO DEALER, DEALER FIRST FLUSHED OUT TRANSMISSION AT $240.00, THEN WITHOUT ROAD TESTING, SUGGESTED WE TRY AGAIN. VEHICLE FAILED ONCE AGAIN WHILE IN THE DEALERSHIP PARKING LOT AND WAS TOLD THE TRANSMISSION NEEDED TO BE REPLACED, $6,000 LATER. *TR

**ODI ID Number :** 10278646
**Date of Failure:** July 24, 2009
**Model:** 2005 XC90
**Summary:**
I HAVE A 2005 VOLVO XC90 T6 WITH 71000 MILES ON IT. ON 7/23/09 THE TRANSMISSION BEGAN TO "SLIP" AND I TOOK IT TO THE VOLVO DEALERSHIP ON 7/24/09 FOR THEM TO DIAGNOSE THE PROBLEM. THE TRANSMISSION ON THIS 4 YEAR OLD VEHICLE NEED TO BE REPLACED AT A COST OF $5,300.00. VOLVO HAS BEEN AWARE OF THE PROBLEM AND SO FAR HAS NOT OWNED UP TO RESPONSIBILITY. THE TRANSMISSION SLIPS IN LOW GEARS AND UPON ACCELERATION. IT IS A SAFETY ISSUES BECAUSE IF THE TRANSMISSION SLIPS WHILE MERGING ONTO THE HIGHWAY IT COULD CAUSE AN ACCIDENT OR AT ANY OTHER TIME FOR THAT MATTER. IT IS A VERY COMMON PROBLEM AND VOLVO SHOULD MAKE THIS A RECALL TO PROTECT THE SAFETY OF THEIR CUSTOMERS BUT THUS FAR THERE HAS BEEN NO RECALL. THE TRANSMISSION IS ON BACK ORDER FOR 1 - 2 MONTHS WHICH IS COMPLETELY UNACCEPTABLE FROM ANY CONSUMER OR SAFETY STANDPOINT. *TR

**ODI ID Number :** 10273725
**Date of Failure:** June 2, 2009
**Model:** 2005 XC90
**Summary:**
I HAVE A 2005 VOLVO XC90 T6 THE TRANSMISSION
JUST FAILED AT ONLY 75000 MILES. MY SON BOUGHT
THE SAME CAR AT THE SAME TIME AS ME BRAND
NEW. HIS TRANSMISSION HAS BEEN REPLACED
TWICE. *TR

**ODI ID Number :** 10231691
**Date of Failure:** June 17, 2008
**Model:** 2005 XC90
**Summary:**
I CURRENTLY OWN A VOLVO XC90 T-6 2005. THE
TRANSMISSION BEGAN TO SLIP IN FIRST GEAR, I HAD
A VOLVO DEALERSHIP TAKE A LOOK AT IT ABOUT
6,000 MILES AGO. NOW, THE URGENT SERVICE LIGHT
CAME ON AND VOLVO STATES THAT THE
TRANSMISSION NEEDS TO BE REPLACED. MANY
OTHERS HAVE EXPERIENCED THESE SAME ISSUES,
SO WHAT IS VOLVO NOT FIXING THESE ISSUES. I
WILL NEVER, NEVER PURCHASE A VOLVO AGAIN. *TR

107.  Not only have these consumers experienced the same defect

that Plaintiffs have, but many of them have also complained about it to

Defendants (and, as evidenced above, they are all publicly available

from the ODI).  As with Plaintiffs' efforts to address the Defendants,

many of these complaints also have gone unheeded.

<u>New Jersey Law Should Apply</u>

108.  To the extent that it is appropriate to engage in a choice of

law analysis for purposes of deciding any motion to dismiss that may be filed by Volvo, New Jersey's substantive laws should apply to the proposed nationwide Class, as defined herein, because Plaintiffs properly bring this Complaint in this District.

109.  New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

110.  Specifically, Defendants' North American headquarters and principal place of business is located in New Jersey.  Defendant Volvo Cars of North America, LLC is registered with the New Jersey State Business Gateway Service.  And according to its website, Volvo's Customer Care Center is located in Rockleigh, New Jersey.[22]

111.  Defendants also own property and conduct substantial business in New Jersey and, therefore, New Jersey has an interest in

---

[22] http://www.volvocars.com/us/footer/contact/Pages/default.aspx

regulating Defendants' conduct under its laws.  Defendants' decision to reside in New Jersey and avail itself of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

112.  A substantial number of members of the Class also reside in New Jersey and purchased their vehicles in New Jersey (including named plaintiff Jason Robinson).

113.  Upon information and belief, New Jersey is also the State from which Defendants' misconduct emanated.  This conduct similarly injured and affected all Plaintiffs and Class members residing in the United States.  For instance, Defendants' marketing and advertising efforts were likely created in and orchestrated from the location of Defendant Volvo NA's present headquarters in New Jersey.  As a result, New Jersey is where the conduct causing injury to the Plaintiffs and Class members occurred and emanated.

114.  The application of New Jersey's laws to the Nationwide Class is also appropriate under New Jersey's choice of law rules because New Jersey has significant contacts to the claims of the Plaintiffs and the proposed Nationwide Class, and New Jersey has a greater interest

in applying its laws here than any other interested state.

## CLASS ACTION ALLEGATIONS

115.   Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3).  Specifically, the nationwide class consists of:

> All persons or entities in the United States who are current or former owners and/or lessees of a Volvo model XC90 T6, model years 2003 through 2005, equipped with a GM sourced, and Volvo modified, 4T65 automatic transmission (the "Nationwide Class").

116.   In the alternative to the Nationwide Class, and pursuant to FED. R. CIV. P. 23(c)(5), Plaintiffs seek to represent the following state subclasses:

> All persons or entities in New Jersey who are current or former owners and/or lessees of a Volvo model XC90 T6, model years 2003 through 2005, equipped with a GM sourced, and Volvo modified, 4T65 automatic transmission (the "New Jersey Class").

> All persons or entities in California who are current or former owners and/or lessees of a Volvo model XC90 T6, model years 2003 through 2005, equipped with a GM sourced, and Volvo modified, 4T65 automatic transmission (the "California Class").

> All persons or entities in Massachusetts who are current or former owners and/or lessees of a Volvo model XC90 T6, model years 2003 through 2005, equipped with a GM sourced, and Volvo modified, 4T65 automatic transmission (the "Massachusetts Class").

> All persons or entities in Florida who are current or former owners and/or lessees of a Volvo model XC90 T6, model years 2003

through 2005, equipped with a GM sourced, and Volvo modified, 4T65 automatic transmission (the "Florida Class").

All persons or entities in Washington who are current or former owners and/or lessees of a Volvo model XC90 T6, model years 2003 through 2005, equipped with a GM sourced, and Volvo modified, 4T65 automatic transmission (the "Washington Class").

117.   Together, the New Jersey Class, California Class, Massachusetts Class, Florida Class, and Washington Class shall be collectively referred to herein as the "State Sub-Classes."  Excluded from the Class and the State Sub-Classes are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the class vehicles for resale, and the Judge(s) assigned to this case.  Plaintiffs reserve the right to modify the Class and State Sub-Class definitions if discovery and/or further investigation reveals that they should be expanded or otherwise modified.

118.   <u>Numerosity</u>:  Upon information and belief, each of the Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe that tens of thousands of class

vehicles have been sold and leased in the United States of America, and thousands of class vehicles have been sold or leased in each of the states that are the subject of the State Sub-Classes.

119.   <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions or law and fact exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

    a.   whether the transmissions in class vehicles are predisposed to fail prematurely;

    b.   whether the transmission in class vehicles contain a design defect;

    c.   whether the defective vehicle design is common to all class vehicles;

    d.   if so, whether the defective transmission design causes the transmission problem in class vehicles;

    e.   whether Defendants knowingly failed to disclose the existence and cause of the transmission the in class vehicles;

    f.   whether Defendants' conduct violates the New Jersey

Consumer Fraud Act and the other statutes asserted herein;

g. whether, as a result of Defendants' omissions and/or misrepresentations of material facts related to the transmission problem and defective transmission design Plaintiffs and members of the Classes have suffered ascertainable loss of moneys and/or property and/or value;

h. whether Plaintiffs and Class members are entitled to monetary damages and/or other remedies, and if so the nature of any such relief; and

i. whether Defendants have been unjustly enriched at the expense of Plaintiffs and Class members.

120. <u>Typicality</u>:  Each of the Plaintiffs' claims are typical of the claims of the Class since each Plaintiff purchased a class vehicle with a transmission problem, defective vehicle design, and defective transmission design, as did each member of the Class.  Furthermore, Plaintiffs and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendants' wrongful conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all

absent Class members.

121.  <u>Adequacy</u>:  Each of the Plaintiffs are adequate
representatives because their interests do not conflict with the interests
of the Class that they seek to represent, they have retained counsel
competent and highly experienced in complex class action litigation,
and they intend to prosecute this action vigorously.  The interests of the
Class will be fairly and adequately protected by Plaintiffs and their
counsel.

122.  <u>Superiority</u>:  A class action is superior to all other available
means of fair and efficient adjudication of the claims of Plaintiffs and
members of the Class.  The injury suffered by each individual Class
member is relatively small in comparison to the burden and expense of
individual prosecution of the complex and extensive litigation
necessitated by Defendants' conduct.  It would be virtually impossible
for members of the Class individually to redress effectively the wrongs
done to them.  Even if the members of the Class could afford such
individual litigation, the court system could not.  Individualized
litigation presents a potential for inconsistent or contradictory
judgments.  Individualized litigation increases the delay and expense to

all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims and registration records, and database of complaints.

123.  Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

<u>VIOLATIONS ALLEGED</u>

<u>COUNT I</u>
**VIOLATION OF THE NJCFA**
**(On Behalf of the Nationwide Class or,**
**Alternatively, the New Jersey Class)**

124.  Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

125.  The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise,

misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J.S.A. 56:8-2.

126.  Plaintiff Robinson, the other named Plaintiffs, and members of the Class are consumers who purchased and/or leased class vehicles for personal, family or household use.

127.  Defendants engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the NJCFA.  Specifically, Defendants were aware that model years 2003 through 2005 of the Volvo XC90 T6 suffered from a common design defect resulting in transmission problems, but failed to disclose this to Plaintiffs and Class members.  Defendants also marketed these luxury vehicles as being of superior quality when the class vehicles contained a known defect. These affirmative misrepresentations were material to the vehicle purchases, and were false statements of fact.

128.  Defendants also engaged in unlawful conduct in violation of the NJCFA by making knowing and intentional omissions.  Defendants knowingly failed to disclose the design defect in the Class vehicles in

order to secure the sale of these vehicles, and to offer them at a premium price.

129.   Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the transmission, which was not readily discoverable until years later, often after the warranty has expired.  As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said design defects and all of the resultant problems.  These facts that Defendants concealed were solely within their possession.

130.   Defendants intended that Plaintiffs and all Class Members rely on the acts of concealment and omissions, so that they would purchase the class vehicles.

131.   Defendants' conduct caused Plaintiffs and Class members to suffer an ascertainable loss.  In addition to direct monetary losses, Plaintiffs and Class members have suffered an ascertainable loss by receiving less than what was promised.

132.   A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiffs and the

Class.  Had the defective vehicle design in the Class vehicles been

disclosed, consumers would not have purchased them or would have

paid less for the Class vehicles had they decided to purchase them.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Nationwide Class or,**
**Alternatively, each of the State Sub-Classes)**

133.  Plaintiffs and the Class repeat and incorporate herein by

reference each and every paragraph of this complaint as though set

forth in full in this cause of action.

134.  Defendants expressly warranted that the class vehicles were

of high quality and, at a minimum, would actually work properly.

135.  Defendants breached this warranty by selling to Plaintiffs

and Class members the class vehicle with known transmission

problems, which are not of high quality, and which fail prematurely.

136.  Defendants' breach of this warranty caused damages to

Plaintiffs and Class members.

137.  Defendants' attempt to disclaim or limit these express

warranties vis-à-vis consumers is unconscionable and unenforceable

under the circumstances here.  Specifically, Defendants' warranty

limitation is unenforceable because they knowingly sold a defective

product without informing consumers about the defect.

138.  The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and member of the Class.  Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Volvo and Class members, and Volvo knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

139.  Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

<u>COUNT III</u>
BREACH OF THE IMPLIED
WARRANTY OF MERCHANTABILITY
(On Behalf of the Nationwide Class or,
Alternatively, each of the State Sub-Classes)

140.  Plaintiffs and the Class repeat and incorporate herein by reference each and every paragraph of this complaint as though set

forth in full in this cause of action.

141.  Defendants impliedly warranted that the class vehicles were of a merchantable quality.

142.  Defendants breached the implied warranty of merchantability, as the class vehicles were not of a merchantable quality due to their defective transmission.

143.  As a direct and proximate result of the breach of said warranties, Plaintiffs and Class members were injured, and are entitled to damages.

144.  Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

145.  The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and member of the Class.  Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A

gross disparity in bargaining power existed between Volvo and Class members, and Volvo knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

146.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

COUNT IV
UNJUST ENRICHMENT
(On Behalf of the Nationwide Class or,
Alternatively, each of the State Sub-Classes)

147.   Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.  This claim is plead in the alternative to the breach of warranty and contract-based claims.

148.   Plaintiffs and Class members conferred a tangible economic benefit upon Defendants by purchasing the class vehicles.  Plaintiffs and Class members would have expected remuneration from the Defendants at the time this benefit was conferred had they known that the transmission within the class vehicles would prematurely fail.

149.  Failing to require Defendants to provide remuneration under these circumstances would result in them being unjustly enriched at the expense of Plaintiffs and the Class.

150.  Defendants were and continue to be unjustly enriched at the expense of Plaintiffs and Class members.  This unjust enrichment was beyond any of Defendants' contractual rights.

151.  Defendants' retention (without an offsetting return payment) of the benefit conferred upon them by Plaintiffs and members of the Class would be unjust and inequitable.

**COUNT V**
**COMMON LAW FRAUD**
**(On Behalf of the Nationwide Class or,**
**Alternatively, the New Jersey Class)**

152.  Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

153.  Defendants made material misrepresentations and omissions concerning a presently existing or past fact.  For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the transmission, which was not readily discoverable until years later, often after the warranty has expired.  As a result, Plaintiffs and the other Class Members were

fraudulently induced to lease and/or purchase the Class Vehicles with the said design defects and all of the resultant problems.

154.  These omissions and statements were made by Defendants with knowledge of their falsity, and with the intent that Plaintiffs and Class members rely on them.

155.  Plaintiffs and Class members reasonably relied on these statements and omissions, and suffered damages as a result.

<u>COUNT VI</u>
**NEGLIGENT MISREPRESENTATION**
**(On Behalf of the Nationwide Class or,**
**Alternatively, the New Jersey Class)**

156.  Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

157.  Defendants negligently provided Plaintiffs and Class members with false information.  Specifically, Defendants negligently made incorrect statements concerning the transmissions in the Class vehicles, and negligently failed to disclose or reveal these known defects.  Meanwhile, Defendants were making numerous affirmative representations about the high quality of its luxury vehicles in general, and of the Class vehicles in particular.

158.  Plaintiffs and Class members justifiably relied on these

negligent representations and omissions.

## COUNT VII
## BREACH OF THE DUTY OF GOOD FAITH
## AND FAIR DEALING
### (On Behalf of the Nationwide Class or,
### Alternatively, the New Jersey Sub-Class)

159.  Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

160.  Every contract in New Jersey contains an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

161.  Defendants breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiffs and Class members of the transmission defect in the Class vehicles, and failing to fully and properly repair this defect.

162.  The Defendants acted in bad faith and/or with a malicious motive to deny the plaintiffs and Class members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

<u>COUNT VIII</u>
## VIOLATION OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200
### (On Behalf of the California Sub-Class)

163.  Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

164.  The California Unfair Competition Law ("UCL") prohibits unfair competition and unfair, unlawful or fraudulent business practices.

165.  Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and Class members the Class vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result of this problem).  Defendants should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this defect.

166.  These acts and practices have deceived Plaintiffs and are likely to deceive the public.  In failing to disclose the design defect and

suppressing other material facts from Plaintiffs and Class members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Class members.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and Class members, as it would have been to all reasonable consumers.

167.  The injuries suffered by Plaintiffs and Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition.  Nor are they injuries that Plaintiffs and Class members should have reasonably avoided.

168.  Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710 and 1750 *et seq.*, and California Commercial Code § 2313.

169.  Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under CAL. BUS. & PROF. CODE § 17200.

<u>COUNT IX</u>
## VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CALIFORNIA CIVIL CODE § 1750, *ET SEQ.*
### (On Behalf of the California Sub-Class)

170.   Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

171.   California's Consumer Legal Remedies Act ("CLRA") prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."  CAL. CIV. CODE § 1770.

172.   Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class members the Class vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result of this problem).   These acts and practices violate, at a minimum, the following sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships,

- 69 -

characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

173. Defendants' unfair and deceptive acts extend to consumer transactions, and caused injuries to Plaintiffs and Class members.

174. Plaintiffs seek all relief available under the CLRA.

## COUNT X
### THE SONG-BEVERLY ACT - BREACH OF EXPRESS WARRANTY VIOLATIONS OF CIVIL CODE § 1790 *ET SEQ.* (On Behalf of the California Sub-Class)

175. Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

176. Plaintiff Morris asserts this cause of action on behalf of himself and the California Sub-Class.

177. As an express warrantor and manufacturer, Volvo had certain obligations under the Song-Beverly Act, and, in particular, Civil Code §1793.2(b) and (d), to conform the Volvo XC90 T6 to the express warranty.

178.   Volvo has been unable to conform the vehicles to the express warranty after a reasonable number of attempts at repair.  Defendant is, therefore, required to either pay damages or reimburse the buyer the purchase price and incidental damages pursuant to Civil Code §§ 1793.2(d) and 1794.

179.   Defendant knew of its obligations under its warranty to pay for a new Vehicle, as needed, caused by the defect described herein. However, Volvo has willfully refused to pay for a new vehicle as required under the warranty.  Volvo is, therefore, liable for not only damages, but also a civil penalty pursuant to Civil Code § 1794.

## COUNT XI
## THE SONG-BEVERLY ACT - BREACH OF IMPLIED WARRANTY VIOLATIONS OF CIVIL CODE § 1790 *ET SEQ*.
### (On Behalf of the California Sub-Class)

180.   Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

181.   Volvo was a merchant in the sale of the automotive vehicles to Plaintiff Morris and the Sub-Class members.

182.   By operation of law, Volvo provided Plaintiff Morris and the members of the California Sub-Class with an implied warranty of merchantability in the sale and lease of the vehicles.

183.   Plaintiff Morris' Vehicle and the vehicles purchased by members of the California Sub-Class are not fit for the ordinary purposes for which such vehicles are used, because the defects cause the vehicles to, among other things, suffer catastrophic transmission failure, thereby seriously impairing the use and functionality of the vehicles in a manner that does not meet the reasonable expectations of Plaintiffs or any other purchaser of the vehicles.  Thus, the vehicles do not operate as they should when used for their ordinary purposes, and the manner in which the defective vehicles do perform is so deficient and below a minimum level of quality so as to render them unfit for their ordinary use and purpose.

184.   By failing to repair the vehicles and by failing to replace the vehicles as needed, Volvo has breached the implied warranty of merchantability.

185.   Plaintiff Morris and the members of the California Sub-Class have been damaged as a result of Volvo breach of the implied warranty.

186.  Plaintiff Morris and the members of the California Sub-Class are entitled to the remedies provided by California Civil Code § 1794.

## COUNT XII
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION LAW
### (On Behalf of the Massachusetts Sub-Class)

187.  Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

188.  MASS. GEN. LAWS ch. 93A, §1, *et seq.* prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

189.  Defendants have engaged in unfair competition and, unfair, unlawful or fraudulent business practices by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class members the Class vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result of this problem).  Defendants should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this defect.

190.  These unfair methods of competition and unfair and deceptive acts have caused injuries to Plaintiffs and members of the Class.  Plaintiffs provided Defendants with a notification pursuant to Massachusetts General Laws c. 93A, §9.  As of the date of the filing of this Amended Complaint, Plaintiffs have not received a response.

**COUNT XIII**
**VIOLATION OF THE FLORIDA**
**DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(On Behalf of the Florida Sub-Class)**

191.  Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

192.  The purpose of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is "to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202 (2).

193.  Defendants have engaged in unfair competition and, unfair, unlawful or fraudulent business practices by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class members the Class vehicles suffer from a design defect (and

the costs, risks, and diminished value of the vehicles as a result of this problem).  Defendants should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this defect.

194.  These unfair methods of competition and unfair and deceptive acts have caused injuries to Plaintiffs and members of the Class.

**COUNT XIV**
**VIOLATION OF THE WASHINGTON
CONSUMER PROTECTION ACT
(On Behalf of the Washington Sub-Class)**

195.  Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

196.  The Washington Consumer Protection Act ("WCPA") provides unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful. REV. CODE WASH. (ARCW) § 19.86.020.

197.  Defendants have engaged in unfair competition and, unfair, unlawful or fraudulent business practices by the practices described above, and by knowingly and intentionally concealing from Plaintiffs

and Class members the Class vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result of this problem). Defendants should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this defect.

198. These unfair methods of competition and unfair and deceptive acts have caused injuries to Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully requests that this Court:

A.      determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.      appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C.      award all actual, general, special, incidental, statutory,

punitive, and consequential damages to which

Plaintiffs and Class members are entitled;

D.      award pre-judgment and post-judgment interest on

such monetary relief;

E.      grant appropriate injunctive and/or declaratory relief,

including, without limitation, an order that requires

Defendants to repair, recall, and/or replace the class

vehicles or, at a minimum, to provide Plaintiffs and

Class members with appropriate curative notice

regarding the existence and cause of the design defect;

F.      award reasonable attorney's fees and costs; and

G.      grant such further relief that this Court deems

appropriate.

/
/
/
/
/

Dated:  November 20, 2009

Respectfully submitted,

By:   *//s// Joseph G. Sauder*
      Joseph G. Sauder
      Matthew D. Schelkopf
      Benjamin F. Johns
      CHIMICLES & TIKELLIS LLP
      One Haverford Centre
      361 West Lancaster Avenue
      Haverford, PA 19041
      Telephone: (610) 642-8500
      Facsimile: (610) 649-3633
      E-mail: JGS@chimicles.com
      MDS@chimicles.com
      BFJ@chimicles.com


      Christopher G. Hayes
      LAW OFFICE OF
          CHRISTOPHER G. HAYES
      225 South Church Street
      West Chester, PA 19382
      Telephone: (610) 431-9505
      Facsimile: (610) 431-1269
      E-mail: chris@chayeslaw.com


      Bruce D. Greenberg
      Lite DePalma Greenberg & Rivas,
      LLC
      Two Gateway Center
      12th Floor
      Newark, NJ 07102
      Telephone: (973) 623-3000
      Email: bgreenberg@ldgrlaw.com

Daniel C. Levin
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Ste. 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
E-mail: dlevin@lfsblaw.com


James C. Shah
SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP
475 White Horse Pike
Collingswood, NJ 08107-1909
Telephone: (856) 858-1770
Facsimile: (856) 858-7012
Email: jshah@sfmslaw.com


Jayne A. Goldstein
SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP
1640 Town Center Circle, Suite 216
Weston, Fl 33326
Telephone: (954) 515-0123
Facsimile: (954) 515-0124
Email: jgoldstein@sfmslaw.com


*Attorneys for Plaintiffs and the
Proposed Class*

## CERTIFICATE OF SERVICE

I certify that on this 20th day of November, 2009, I caused the

foregoing **PLAINTIFFS' FIRST AMENDED COMPLAINT** to be filed

using the Court's CM/ECF filing system, and caused a copy thereof to be

electronically served upon all registered users in this case.


*/s/ Joseph G. Sauder*
Joseph G. Sauder